# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * *
| | | |
|---|---|---|
| GEORGE DOMINGUEZ, | * | |
| | * | No. 12-378V |
| Petitioner, | * | Special Master Christian J. Moran |
| | * | |
| v. | * | |
| | * | Filed: May 25, 2018 |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | Attorneys' fees & costs; |
| | * | hourly rate for Ph.D. immunologist. |
| Respondent. | * | |

* * * * * * * * * * * * * * * * * * *

Clifford Shoemaker, Shoemaker, Gentry & Knickelbein, Vienna, VA for petitioner;
Darryl R. Wishard, United States Dep't of Justice, Washington, DC, for respondent.

### PUBLISHED DECISION ON REMAND AWARDING ATTORNEYS' FEES AND COSTS ON AN INTERIM BASIS[1]

On July 29, 2017, petitioner moved for interim fees, requesting $40,915.80 in fees and $34,095.70 in costs, for a total of $75,011.50. These fees and costs covered the period ending on the date of the filing of the motion.

Two days later, respondent filed his response to petitioner's motion. In his response, respondent did not object to petitioner's request. Resp't's Resp. at 2. Instead, respondent stated that he was "satisfied that the statutory and other legal requirements for an award of attorneys' fees and costs are met." Id.

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

Based on the rationale expressed in Swintosky v. Sec'y of Health & Human Servs., No. 12-403V, 2017 WL 5899239 (Fed. Cl. Spec. Mstr. Nov. 6, 2017), on December 18, 2017, the undersigned awarded petitioner the full amount of his request for fees and costs.

On January 16, 2018, respondent moved for a review of the undersigned's decision on interim fees and costs.  The Court granted respondent's motion and remanded the case to the undersigned for reconsideration of the fees decision applying the "lodestar approach set forth in the controlling precedent." Opinion and Order, 2018 WL 1514447 (Fed. Cl. Mar. 8, 2018).

Shortly after the decision on interim fees was remanded, petitioner moved to dismiss his case.  Pet'r's Mot., filed Mar. 30, 2018.  This motion for dismissal was granted.  Decision, issued Apr. 2, 2018, 2018 WL 1514447.  Thus, petitioner is now eligible to file a motion for final fees and costs.  Nonetheless, this decision implements the Court's instructions.  See Vaccine Rule 28 (establishing time for remand).  Furthermore, whether the motion is labelled as one for final fees or interim fees does not affect the ultimate procedure or outcome in this case.

Based upon a lodestar analysis, a reasonable amount of attorneys' fees and costs is $39,464.25.

\*   \*   \*

**I.   Attorneys' Fees**

To determine reasonable attorneys' fees under the Vaccine Act, the Federal Circuit has approved the lodestar approach.  This is a two-step process.  Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1348 (Fed. Cir. 2008).  First, the court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)).  Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. Id. at 1348.  Here, an adjustment is not required.

  A. Reasonable Hourly Rates

Mr. Dominguez seeks reimbursement for work performed by three different attorneys: Clifford Shoemaker, Renee Gentry, and Sabrina Knickelbein.  The rates requested are presented in the table below in **bold**.

2

In determining what constitutes a "reasonable hourly rate," special masters generally defer to the rate schedule adopted in McCulloch v. Sec'y of Health & Human Servs., No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), with annual adjustments made for inflation. The range of rates suggested by McCulloch for each of the attorneys is noted in a parenthetical next to the requested rate.

|  | 2015 | 2016 | 2017 |
| --- | --- | --- | --- |
| Clifford Shoemaker | **$415** ($385 – $430) | **$430** ($385 – $430) | **$446** ($394 – $440) |
| Renee Gentry | **$400** ($350 – $415) | -- | **$430** ($358 – $424) |
| Sabrina Knickelbein | **$350** ($300 – $375) | **$365** ($300 – $375) | **$378** ($307 – $383) |

Neither petitioner nor respondent made an argument for departing from the McCulloch guidance and thus the undersigned sees no reason to depart from those guidelines here. Accordingly, Mr. Shoemaker's and Ms. Gentry's 2017 rates should be reduced to be within the guidelines suggested by McCulloch.[2]

As for where in the range the attorneys' hourly rate should be set, McCulloch also provides some additional guidance, noting that "the following factors are paramount in deciding a reasonable forum hourly rate: experience in the

---

[2] It is curious why Mr. Shoemaker proposes rates that are marginally outside the McCulloch guidelines without any argument for why a departure from the guidelines is appropriate. Mr. Shoemaker is surely aware that his requested amount is not within the McCulloch guidelines. For two recent examples where a special master reduced Mr. Shoemaker's rates to fall within the guidelines, see Bookey by Rosenbloom v. Sec'y of Health & Human Servs., No. 13-026V, 2017 WL 2544892 (Fed. Cl. Spec. Mstr. May 18, 2017), and Meramo by Meramo v. Sec'y of Health & Human Servs., No. 15-1234V, 2017 WL 4321084 (Fed. Cl. Spec. Mstr. Sep. 1, 2017). Absent an argument that Mr. Shoemaker deserves to be paid at a rate higher than the listed rate, Mr. Shoemaker's continued practice of requesting departures from the guidelines consumes judicial resources unnecessarily. Mr. Shoemaker is warned that requesting an excessive hourly rate without any argument in support of that rate may result in a penalty. See Valdes v. Sec'y of Health & Human Servs., No. 99-310V, 2009 WL 1456437, at *4 (Fed. Cl. Spec. Mstr. Apr. 30, 2009) (warning Mr. Shoemaker that penalties may be necessary to motivate him to submit requests for fees that do not contain "erroneous, duplicative, or unreasonable entries"), mot. for rev. granted in non-relevant part and denied in non-relevant part, 89 Fed. Cl. 415 (2009).

3

Vaccine Program, overall legal experience, the quality of work performed, and the reputation in the legal community and community at large." Id. at *17.

In the case of the attorneys here, each has considerable experience in the Vaccine Program and, accordingly, deserves compensation at the top of their respective ranges. Accordingly, Mr. Shoemaker's 2017 hourly rate is reduced to the maximum 2017 rate: $440. Similarly, Ms. Gentry's 2017 rate is reduced to $415. The undersigned finds all other proposed rates appropriate.

However, the rates adopted here envision the attorney in question doing the work of an attorney. When an attorney does the work of a paralegal or administrative assistant, he or she should be paid a rate commensurate with the nature of the work. See Valdes v. Sec'y of Health & Human Servs., 89 Fed. Cl. 415, 425 (2009) (noting that "the Special Master exercised appropriate discretion in denying requested costs for work performed by Petitioner's counsel's associate" when the special master determined "that the associate's time spent obtaining medical records was more consistent with paralegal duties."); see also Bratcher v. United States, No. 15-986, 2018 WL 1225032, at *8 (Fed. Cl. Mar. 9, 2018) (declining to reimburse for work even at paralegal rates when plaintiffs failed to demonstrate that the work was not "largely clerical or secretarial in nature").

Ms. Knickelbein's work in this case is more consistent with the work of a paralegal, or even an administrative assistant, than an experienced attorney. The vast majority of Ms. Knickelbein's documented work shows that her primary function in this case was to collect medical records, to file material through the CM/ECF system, and to act more generally as a go-between between Mr. Shoemaker and the court, the clients, and the experts. These tasks, in the undersigned's experience, are almost universally billed at a non-attorney rate. The finding that Ms. Knickelbein's work is more consistent with paralegal work is not novel to this case. The undersigned made the same finding in Valdes 2009 WL 1456437, at *4, mot. for rev. denied in relevant part, 89 Fed. Cl. at 425 (2009), and Turpin v. Sec'y of Health & Human Servs., No. 99–535V, 2008 WL 5747914, at *5–7 (Fed. Cl. Spec. Mstr. Dec. 23, 2008). Accordingly, Ms. Knickelbein's work will be reimbursed at the top of the McCulloch range for paralegal work: $145 in 2015 and 2016, and $148 in 2017.

Based on the adjustments detailed above, the fee award is reduced to $36,175.10.

### B. A Reasonable Number of Hours

Having established an appropriate rate for counsel's time, the undersigned turns to the amount of time counsel billed on this matter in order to determine the total fee award.

To facilitate the process of evaluating the reasonableness of an attorney's activities, in November 2004, the Office of Special Masters issued revised Guidelines for attorneys. The Guidelines state "counsel are advised to maintain detailed contemporaneous records of time and funds expended under the Program." Office of Special Masters, Guidelines for Practice under the National Vaccine Injury Compensation Program (Rev. Nov. 2004) at § XIV. Detailed (or stated another way, non-vague) contemporaneous records are the petitioner's responsibility and allow the Office of Special Masters to determine the reasonableness of attorneys' fees requests. See Avgoustis v. Shinseki, 639 F.3d 1340, 1344-45 (Fed. Cir. 2011) (stating that requiring entries which permit effective review of the fees is in accord with cases from the Federal Circuit and the Supreme Court).

Inconsistent with the Guidelines and Avgoustis, the petitioner's attorneys' billing records are often vague. This is especially an issue with Mr. Shoemaker's records, which frequently leave out the subject matter of correspondence. For example, records such as "Email from Sabrina," "Email to and from Dr. Mikovits," and "PC with Dr. Mikovits" make an effective review of appropriateness difficult. A review of all of Mr. Shoemaker's entries makes clear that this vagueness is common. Mr. Shoemaker's entries can be contrasted with Ms. Gentry's records, which consistently note the nature of the correspondence, for example: "email to client re settlement demand," "email from & to doj re doj rejecting settlement w/o making counter," and "E-mail to client regarding the Court's last order."

Although Mr. Shoemaker's individual records are difficult to evaluate due to his vague records, the undersigned is left with the overall impression that his claimed work is approximately reasonable given the nature of the case. Therefore, denying his requested fees in toto would be inappropriate. However, to account for the vagueness, the undersigned finds a 15% fee reduction to be appropriate. See Abbott v. Sec'y of Health & Human Servs., 135 Fed. Cl. 107 (2017) (holding that the special master acted within his discretion in reducing an award based on vague billing entries); see also Almanza v. United States, No. 13-130, 2018 WL 1704521,

5

at *7 (Fed. Cl. Apr. 9, 2018) (reducing specific time entries with block billing by 50 percent because the Court could not assess the reasonableness of the activity). Since Mr. Shoemaker's individual billings following the previous adjustment total $27,543.70, this reduction reduces the total fee award by $4,131.55. The total awarded in attorneys' fees is thus $32,043.55.

## II.   Costs

Mr. Dominguez also moves for reimbursement of $34,095.70 in costs. This includes routine costs of $31.20 for photocopies and $114.50 in costs for obtaining medical records. These costs are reasonable and awarded in full.

The balance of costs comes from an invoice of $33,950.00 for expert services provided by Ms. Mikovits and Mr. Ruscetti. Although both Ms. Mikovits and Mr. Ruscetti signed the expert reports, Ms. Mikovits was to be the testifying witness and the analysis here thus refers solely to her.[3]

Like attorneys' fees, a request for reimbursement of costs must be reasonable. Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 34 (Fed. Cl. 1992), aff'd, 33 F.3d 1375 (Fed. Cir. 1994). Reasonable expert fees are determined using the lodestar method, in which a reasonable hourly rate is multiplied by a reasonable number of hours. Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 779 (2013).

### A.   A Reasonable Hourly Rate for Ms. Mikovits

To determine the reasonableness of this rate, it is appropriate to consider the "area of expertise; the education and training required to provide necessary insight; the prevailing rates for other comparably respected available experts; the nature, quality, and complexity of the information provided; [and] the cost of living in the

---

[3] More generally, the undersigned is aware that "MAR Consulting" has submitted a number of reports in Vaccine Program cases, all signed by both Mr. Ruscetti and Ms. Mikovits but with Ms. Mikovits being the testifying witness in each case. Thus, it remains unclear the extent to which the opinions contained in the report reflect the analysis and conclusions of Mr. Ruscetti exclusively. The invoice for the work indicates that a small fraction of the work was performed by Mr. Ruscetti. See Pet'r's Resp., filed Mar. 19, 2018, at 3-5.

expert's geographic area." Sabella v. Sec'y of Health & Human Servs., 86 Fed. Cl. 201, 206 (2009). Furthermore, "[p]etitioner has the burden of providing the foregoing information concerning expert fees." Id. Ms. Mikovits has billed an hourly rate of $350.

An hourly rate of $350 is consistent with the range of rates provided to expert medically-trained immunologists with extensive research experience that testify in the Vaccine Program. See, e.g., Laderer v. Sec'y of Health & Human Servs., No. 09-097V, 2016 WL 3044838, at *6 (Fed. Cl. Spec. Mstr. Apr. 20, 2016) (awarding an immunologist, Dr. Shoenfeld, $400 per hour); Crutchfield v. Sec'y of Health & Human Servs., No. 09-39V, 2011 WL 3806351, at *8 (Fed. Cl. Spec. Mstr. Aug. 4, 2011) (paying Dr. Shoenfeld, $350 per hour); Savin v. Sec'y of Health & Human Servs., No. 99-537V, 2008 WL 2066611, at *4 (Fed. Cl. Spec. Mstr. Apr. 22, 2008) (awarding another board-certified immunologist, Dr. Bellanti, $350 per hour without objection by the Secretary), mot. for rev. denied on non-relevant grounds, 85 Fed. Cl. 313 (2008).

However, Drs. Bellanti and Shoenfeld are both physicians with medical training. This medical training has often proved, in the undersigned's experience, invaluable in vaccine injury cases.[4]

It is true that Ms. Mikovits has been awarded a Ph.D. in biochemistry and neither Dr. Bellanti nor Dr. Shoenfeld has a Ph.D. While earning a Ph.D. is, itself, an accomplishment, an advanced degree is neither sufficient nor necessary for demonstrating the scientific expertise expected of expert witnesses in the Vaccine Program. For instance, while it is true that Dr. Bellanti and Dr. Shoenfeld do not have a Ph.D., they are each far more widely published than Ms. Mikovits. Dr. Bellanti has co-authored over 275 research articles and Dr. Shoenfeld has co-authored over 2,000. Beyond the expertise and experience that Drs. Bellanti and Shoenfeld bring to the program as physicians, their publication record suggests that they are capable scientists as well. In the undersigned's estimation, the publication

---

[4] Often parties will need to supplement an expert opinion provided by a non-medically trained expert with an opinion provided by a physician. Physician-scientists can thus present a bargain to parties in their ability to provide expert opinion regarding not only the science, but the diagnoses and treatment as well.

record provides information useful in determining an individual's scientific expertise in a given field.

Even though a petitioner bears the burden to demonstrate the reasonableness of his expert's hourly rate, petitioner's original motion for fees and costs did not provide any support for Ms. Mikovits' $350 hourly fee.  Petitioner was subsequently provided an opportunity to file support for Ms. Mikovits' rate.  See order, issued Apr. 6, 2018.

In response to this invitation, petitioner filed very similar affidavits from four individuals stating that they paid Mr. Ruscetti individually, or Mr. Ruscetti's and Ms. Mikovits' consulting firm (MAR Consulting, Inc.) between $350 and $500 per hour for an unspecified amount of time.  No affidavit pertained to Ms. Mikovits individually.  The affidavits provide very little information about the nature of the work that Mr. Ruscetti or MAR Consulting, Inc. performed.[5]  Without any substantive description of the work that MAR performed, these affidavits carry little weight in determining a reasonable hourly rate for providing opinions in the Vaccine Program.

Based on the undersigned's experience and the cases cited above, there does appear to be support for using $450 per hour as a reference point for a reasonable hourly rate for a medically-trained immunologist with extensive research experience.  Given that starting point, the next step is to adjust it to account for Ms. Mikovits' lack of medical experience and expertise.  Based on the undersigned's knowledge and experience, a physician-scientist appears to warrant an additional $200 per hour compared to equally capable research scientist without a medical degree and experience for at least two reasons.  First, a physician can opine on medical questions in addition to purely scientific ones and thus provides additional value to the Program.  Second, a physician's time is more valuable outside of the Program since they can earn compensation not only through their research work, but their clinical work as well.  The $200 per hour premium may actually

---

[5] One affiant owns a company called Success Summits, LLC.  It appears that Success Summits, LLC is in the life coaching business.  The affidavit from the owner of Success Summits, LLC does not indicate that the consultation related to medical or scientific matters, unlike the other affidavits that were based on the same form language.

undervalue the real-world value of a medical degree.  Thus, the undersigned finds $250 per hour to be a suitable rate of compensation for a comparably respected expert in immunology who does not practice medicine.

However, Ms. Mikovits is not a comparably respected expert in immunology.  Ms. Mikovits' scientific credentials could be generously labelled as having a checkered past.  Ms. Mikovits' reputation began to unravel after a paper she wrote in 2009 — linking a mouse virus (XMRV) with chronic fatigue syndrome — was retracted by the publisher.  See court exhibit 1001 (Bruce Alberts, Retraction, 334 Science 1636 (2011)).  The publisher stated that the retraction was due to multiple other studies being unable to confirm the results (including studies performed by some of the original authors), evidence of poor quality control in some of the experiments, and evidence of manipulation or mislabeling of certain figures used in the studies.  Id.

At the time questions began to be raised about the XMRV-CFS article, Ms. Mikovits was employed as the Research Director of the Whittemore Peterson Institute for Neuroimmune Disease (WPI).  Exhibit 25 at 2.  However, Ms. Mikovits was fired from this position that same year, and WPI later accused her of stealing and deleting research materials from the institute.  See Rogero v. Sec'y of Health & Human Servs., No. 11-770V, 2017 WL 4277580, at *47 (Fed. Cl. Spec. Mstr. Sept. 1, 2017); court exhibit 1002 (Trine Tsouderos, Discredited Chronic Fatigue Researcher in California Jail, Chicago Tribune, Nov. 22, 2011).  This incident with WPI diminishes her relative reputation as a scientist.

Ms. Mikovits has not held a research position since 2012.  See exhibit 25 at 1-2.  Since then, she has worked as an advisor to Yorkbridge Capital and has co-founded and worked as a consultant for MAR Consulting Inc.  Id.  Her current services are provided through her role with MAR Consulting.  Id. at 1.  According to her C.V., Ms. Mikovits has also not published scientific research since 2012, and her last three publications consist of (1) a research article failing to replicate the retracted 2009 XMRV-CFS article, (2) a short statement partially retracting the 2009 XMRV-CFS article (the full retraction was made by the editor himself), and (3) another research article failing to replicate the retracted 2009 XMRV-CFS article.  See id. at 9.  The absence of any publications, or apparently any research activity at all, in the past six years weighs heavily against the relative reputation she holds in the field of immunology.

Based on her reputation and bona fides, Ms. Mikovits' credentials are simply not in the same league as experts who are paid $250 (or more) per hour. While this does not mean that Ms. Mikovits is incapable of providing expert testimony on specific topics, it does mean that she cannot expect to be paid the same hourly rate as those with much better reputations than she. Individuals with better reputations are, presumably, in far higher demand. Accordingly, based on the rate that the undersigned found reasonable for non-medically trained immunologists—$250 per hour—the undersigned makes an additional deduction of 40%. This deduction reflects Ms. Mikovits' relative lack of reputability in the field compared to comparable experts. This results in a rate of $150 per hour for a non-medically trained immunologist of Ms. Mikovits' reputation.

An appropriate rate for an expert also depends, in part, on "the nature, quality, and complexity of the information provided." Sabella, 86 Fed. Cl. at 206. Ms. Mikovits' work in this case was, frankly, poor. Her reports were riddled with errors, exaggerations, and false statements. A non-exhaustive list includes:

1. "Several vaccines have been documented to have contributed to vasculitis." Exhibit 24 at 9. As Dr. Forsthuber pointed out, the references Ms. Mikovits cites in support of this claim do not say this. Exhibit H at 6. In fact, they often expressly discredit this interpretation. Id.

2. "Moreover, many types of inflammatory vasculitis including granulomas following vaccinations have been reported. (Ex44 - Kallenberg)." Exhibit 24 at 13. As Dr. Forsthuber pointed out, this reference does not discuss vaccines at all. Exhibit H at 6.

3. "Within fourteen days [of the vaccination] on 9/16/2011, Mr. Dominguez was seen at Kaiser for blurred vision (Ex1@60)." Exhibit 24 at 15. This statement was critical since it was the first medical record following the August 31, 2011 vaccination and the theory that Ms. Mikovits put forth linking the Tdap vaccine and Mr. Dominguez's disease indicated that there should be a rapid onset of the illness. See id. Thus, when Ms. Mikovits stated that he was seen for "blurred vision" 14 days following the vaccination, it induces a fact-finder to infer that the blurred vision may be the first symptom related to the onset of his disease, lending credibility to her theory. However, as Dr. Forsthuber pointed out, Ms.

    Mikovits failed to mention the records stated the "chief complaint/reason for visit" was "routine" and that he was there that day for an "eye examination." Exhibit 1 at 57-60. No abnormal findings were made except that he was diagnosed with myopia and provided with a new lens prescription. Id. By not providing the context for this visit, Ms. Mikovits' characterization of Mr. Dominguez's visit is, at best, misleading.

4. Ms. Mikovits' proposed medical theory was based on the premise that checkpoint inhibitors were analogous to vaccines. Checkpoint inhibitors are a form of cancer treatment that allows immune cells to attack cancer cells by having them bypass internal "brakes" that limit what the immune cells consider foreign. See exhibit H at 7. A consequence of this potent pharmaceutical treatment is that immune cells will also attack healthy host cells. This can lead to side effects that, though sometimes severe, are outweighed by the benefit the treatment provides. Ms. Mikovits never provided a logical basis beyond mere ipse dixit for this proposed equivalency.

5. "The experience of toxic shock deaths from toxins contained in tampons and legionnaire's disease outbreaks of the 90s directly inform the reliability of this theory that a vaccine can cause severe immune related adverse events by a toxic cytokine/chemokine storm as does the recent experience of the toxicity realized in the brutally selective checkpoint inhibitors in cancer immune therapy." Exhibit 24 at 14-15. The undersigned, like Dr. Forsthuber, is "at a loss" in how Ms. Mikovits connects toxic shock, Legionnaire's disease, and checkpoint inhibitors with Mr. Dominguez's Tdap vaccination. Exhibit H at 11.

6. "Since he had been given this vaccine in 2006 and a booster is recommended every ten years and since the patient was suffering from viral induced inflammation, it was inappropriate to give him TDaP which would induce more inflammation." Exhibit 24 at 15. In the undersigned's experience, Ms. Mikovits is all too willing to "play medical doctor" by frequently making statements, such as this one, that challenge the treatment given by petitioners' treating physicians. This is not a new complaint of Ms. Mikovits' conduct. See Rogero, 2017 WL

>4277580, at *24 ("her expert testimony seemed to shift throughout the litigation, often veering into opinions concerning medical disciplines in which she was wholly unqualified"). Ms. Mikovits is not trained as a physician and has no experience as a physician. See exhibit 25 at 1-5. This explains why Ms. Mikovits, when she does make medical opinions, will often make incorrect statements, such as the one cited above. As Dr. Forsthuber pointed out, "Tdap can be administered regardless of the interval since the previous Td dose (CDC Tdap recommendations). Halperin et al. concluded in a study of 7,156 children that Tdap can be safely administered at intervals > than 18 months since the previous TD/Td vaccine (24), and G.D. had received the Td vaccination in 2006, i.e. 5 years earlier." Exhibit H at 11.

Though given the opportunity in her supplemental report (exhibit 68), Ms. Mikovits did not adequately (or, more typically, at all) address these issues and others after they were raised by respondent.

Based on the deficiencies in Ms. Mikovits' reports, shortly before the scheduled hearing Mr. Dominguez moved to dismiss his petition, noting that "[a]n investigation of the facts and science supporting has demonstrated to the Petitioner that he will be unable to prove that he is entitled to compensation in the Vaccine Program." Pet'r's Mot., filed Mar. 30, 2018, at 1. He further noted: "In these circumstances, to proceed any further would be unreasonable and would waste the resources of the Court, the Respondent, and the Vaccine Program." Id. In the undersigned's opinion, the poor quality of Ms. Mikovits' reports resulted in this matter being drawn out far longer than it should have. By filing a report that relied on mischaracterizations, statements that she was not qualified to make, and misdirection, Ms. Mikovits wasted the resources of the Vaccine Program. Based on the inferior quality of her work, the undersigned finds an additional 50% reduction of Ms. Mikovits' rate appropriate. Ms. Mikovits' work will be compensated at a rate of $75.00 per hour.[6]

---

[6] The undersigned notes that Ms. Mikovits' invoice indicates that Mr. Ruscetti performed some of the work contained in the invoice. As noted above, because Ms. Mikovits was the testifying witness and the invoice indicates that she

12

Furthermore, since the evidence indicates that the quality of Ms. Mikovits' work here is consistent with the quality of work she has previously submitted in Vaccine Program cases and with the reputation of her work as a scientist more generally, Mr. Shoemaker and other attorneys are put on notice that future reliance on Ms. Mikovits may not be reasonable.

B.   Reasonable Number of Hours

The undersigned finds that the number of hours billed by Ms. Mikovits is generally consistent with the amount billed in comparable proceedings. Consequently, the amount awarded for Ms. Mikovits' work is $7,275.00.

\*   \*   \*

Accordingly, petitioner is awarded:

**A lump sum of $39,464.25 in the form of a check made payable to petitioner and petitioner's attorney, Clifford Shoemaker.**

These amounts represents reimbursement attorneys' fees and other litigation costs available under 42 U.S.C. § 300aa-15(e). In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith. The Clerk's Office is also directed to provide this decision to the presiding judge pursuant to Vaccine Rule 28.1(a).

s/Christian J. Moran
Christian J. Moran
Special Master

---

performed nearly all the work, she is referenced throughout this decision individually. Nonetheless, the analysis provided in this decision largely applies to Mr. Ruscetti as well.

13